**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRYAN AND JACQUELINE GRANELLI (f/k/a JACQUELINE HOEY), | Civil Action No.: 10-2582 (JLL) |
| Plaintiffs, | |
| v. | **OPINION** |
| CHICAGO TITLE INSURANCE COMPANY aka/dba CHICAGO TITLE INSURANCE OF NEW JERSEY, INC. and FIDELITY NATIONAL TITLE INSURANCE | |
| Defendants. | |

This matter comes before the Court on Defendants' Motion for Partial Summary Judgment. The Court has considered the submissions of the parties and decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

## I.    BACKGROUND

Plaintiffs in this proceeding, Bryan and Jacqueline Granelli ("Plaintiffs"), own the property that is the subject of the current dispute, 221 Summit Drive, Boonton, New Jersey (the "Boonton Property"). Mrs. Granelli purchased the home in March 1998, prior to marrying her husband, Bryan (J. Granelli Dep. 12:3, January 19, 2011.) Mrs. Granelli, formerly Ms. Hoey, purchased Residential Title Insurance Policy (the "Policy") from Chicago Title Insurance Company in the amount of $137,000. The Policy was issued to Jacqueline Hoey and John

1

Thompson, Mrs. Granelli's former boyfriend with whom she purchased the home. Defendants in this proceeding, Chicago Title Insurance Company and Fidelity Title Insurance ("Defendants"), admit selling Mrs. Granelli the Policy bearing the number 3181976488. (Def. Answer 3:18.) Defendants, however, deny they "failed to guarantee good title," as alleged by Plaintiffs. (Id. at 3:13.)

Subsequently, Mr. Thompson left the residence and Mr. Granelli moved into the home in 2001. (B. Granelli Dep. 10:25.)  Mr. Granelli was not a beneficiary listed on the Policy. Plaintiffs, however, allege that Mr. Granelli, as Mrs. Granelli's spouse, is entitled to all the same rights and privileges as Mrs. Granelli under the contract. (Pl. State. of Facts 2:6.)   Defendants dispute Mr. Granelli's rights under the Policy.  The couple lived together in the Boonton Property from 2001 to January 2008.  (See B. Granelli Dep. 77:11-13.)  Plaintiffs listed the Boonton Property for sale in 2005.   Despite having one or more buyers contract to purchase the home, Plaintiffs have not yet sold the home. (Pl. State. of Facts 5:21.)

Border disputes began to pose a problem for the homeowners beginning in 2007; the problem remains to this day.  (B. Granelli Dep. 25:8-9.)  Several boundary discrepancies existed relating to the Boonton Property: the "Brown Dispute," the "Van Driel Dispute," the "Driveway Dispute," and the "Boonton Township Dispute." (Pl.'s Resp. to Def. Interrog. 10:8.)  The Brown Dispute was the first to come to Plaintiffs' attention, although there is some disagreement as to what and when exactly Plaintiffs first knew about the boundary problem.  (B. Granelli Dep. 15:5-18:4.)  It is undisputed that Plaintiffs were aware of the Brown Dispute in January 2007.  (Id.) At that time, Plaintiffs needed to construct a French drain on their neighbor Mr. Brown's property, to facilitate water drainage.  (Id.)  Plaintiffs planned to construct the drain running parallel with a rock wall that separated Plaintiffs' property from Mr. Brown's property.  (Id.)

Plaintiffs frequently had confrontations with Mr. Brown regarding the property's border. (Id.) Plaintiffs, hoping to avoid another confrontation with their neighbor, sought a property survey. (Id.)  The survey discovered that Plaintiffs' property actually extended sixteen feet onto Mr. Brown's property.  (Id.)

After discovering the boundary disparity in the Brown Dispute, Plaintiffs purchased a second home (the "Kearney Property") during the fourth quarter of 2007.  They moved into the home in January 2008.  (B. Granelli Dep. 77:11-13.)  At the time, the Boonton Property was for sale, and Plaintiffs testified that they believed this was their only opportunity to own "their dream home" – the Kearny Property.  (Id. at 77:5-10.)  The purchase made them responsible for two mortgages—a situation they anticipated would only last a short time, perhaps a number of months. (Id. at 77:1-2.)

It is a matter of factual dispute whether Plaintiffs were aware of the second boundary dispute, the Driveway Dispute, prior to purchasing the Kearney Property.  This dispute relates to an overlap of Plaintiffs' driveway and walkway.  (Def. Interrog. 10:8).  Again, the date Plaintiffs became aware of the boundary problem is the subject of some debate in this proceeding.  (B. Granelli Dep. 24-25.)  Mr. Granelli received a letter from Richard Smith in October 2007 that outlined the Driveway Dispute as it existed according to Mr. Smith's research.  Id.  Mr. Granelli, however, alleges he did not read the letter detailing the Driveway Dispute in full until October 2008. (Id.)  According to Mr. Granelli, this section of Plaintiffs' land is located on what is deemed to be the adjoining property.  (Id.)  Despite this fact, Defendants allege that the driveway encroachment and part of the walkway were specifically excluded from coverage in the Policy. (Id. at 22-23.)

Finally, the Boonton Township Dispute involves the property line constructed from old tax maps. (La Plante Dep. 22:23-23:25.) The property line derived from the tax maps showed the border of Plaintiffs' property running directly through the center of their home.  (Def. Interrog. 10:8.)  It is undisputed that Plaintiffs were unaware of such a disparity until August 2008.  (Pl. State. of Facts 4:14)

In 2008, June Van Driel contracted to purchase Plaintiffs' home.  (B. Granelli Dep. 40:1-3.)  She went so far as to move her personal effects into the home.  (Id.) Ms. Van Driel, however, later cancelled the purchase of the home in August 2008—an action that resulted in litigation between the Granellis and her. (J. Granelli Dep. 28-29: 19-6.) The reason for Ms. Van Driel's cancellation is a matter of dispute between the Defendants and Plaintiffs in this case.  Plaintiffs believe the inability to perfect title was the primary cause for the cancellation.  (B. Granelli Dep. 39:22-40:25.)  In his deposition, Mr. Granelli's stated, "August 2008, June Van Driel did not close on the house due to defective title exposing the boundaries in question."  (Id. at 18: 6-9.) Defendants allege that certain other problems with the home might have motivated Van Driel to back out of the deal.

Plaintiffs filed their initial claim with Defendants in August 2008, after the Van Driel sale did not close.  (Pl. Resp. to Def. Interrog. 12:13.)  Significant confusion followed in the subsequent months.  Restructuring within the insurance company caused the complaint to be transferred to several different claims agents within Defendants' entities.  The initial claim was assigned to Jason Bergman, who worked on the complaint between August 2008 and February 2009.  (Pl. Brief, Ex. J. at 1-8.)  Mr. Bergman worked on the claim until it was passed to Mr. Shawn Grimsley.  (Id.)  Mr. Grimsley worked on the claim between February 2009 and October 2009.  (Id.)

4

According to Defendants, the claim submitted by Plaintiffs was a complex and difficult matter to resolve.  (See Le Plante Dep. 23:6-25.)  The Boonton Township Dispute in particular required a significant amount of work and research due to the tax map discrepancies.  (Id.)  Mr. Grimsley worked most closely on this claim; his efforts included hiring an appraiser to value the land to be forfeited in the quit claim action associated with Mr. Brown.  (Id. at 29.)  He also pulled maps and surveys, consulted with surveyors and appraisers, and spoke with the city over a period of months.  (Id. at 30-31.)  Defendants assert that it made every effort to resolve the issue without having to pursue litigation, including efforts to resolve the problem with neighbors.  A claim determination was issued in May 2009, which stated a quiet title action would be required to resolve this claim.  After making this determination, Mr. Grimsley reached out to Defendants' in-house counsel, Mr. Romanowsky.  (Id. at 31-32.)  Prior to pursuing the quiet title action, Mr. Romanowsky attempted to reach out to the neighbors by sending a letter to all of those that would potentially be involved in the quiet title claim.  (Id.  at 34.)  These efforts proved fruitless, and the quiet title litigation was commenced in April 2010.  (Id.)  Throughout the order, the insurance company made a number of offers to issue a letter of indemnification to potential purchasers.  (Id.)  Ultimately, the quiet title litigation achieved a resolution to the boundary issues associated with the property, leaving it free of any encumbrances.  (Pl. State. of Facts 2:4.) The quiet title litigation, however, did not reach a resolution until August 2011, three years after Plaintiffs filed their initial complaint with Defendants'.  (Id.)

During the claim dispute, Plaintiffs experienced a number of misbegotten sales of the Boonton Property.  Approximately five individuals attempted to purchase the home, albeit unsuccessfully, two of which occurred after the claim was filed with Defendants. (B. Grenelli Dep. 82-91.)  According to Plaintiffs, every lost purchase after the Van Driel Dispute in August

2008 was attributable to the title defects.  (Id.)  After the Van Driel sale was terminated, Mr. Granelli claims he kept track of all expenses associated with the Boonton Property. (Pl. Brief, Ex. I.)  These expenses include utilities, mortgage payments, property taxes, and maintenance costs. Id.

Plaintiffs claim $83,032.34 in direct damages associated with the maintenance, repair, and costs associated with ownership of the Boonton Property since August 2008.  (Pl. Brief, Ex. I.)  Plaintiffs also include damages for the value difference between the 2008 sale price, $308,000, and the current sale price, $228,150, a difference of $79,850.  Id.  Plaintiffs also allege that they are entitled to the taxes they would owe for the sale of the property, $28,482.00.  Id.  Plaintiffs claim had they sold the home in 2008 they would have been entitled to the federal tax rule that allows the exclusion of gains on a principle residence up to $500,000 for a married couple.  To this date, however, the Boonton Property has not been sold.  The alleged sale price and tax values are based solely on Plaintiffs' estimates. Plaintiffs also claim $27,350 dollars in legal fees.

Additionally, both Mr. and Mrs. Granelli allege severe emotional distress as a direct result of the title issues.  (See J. Granelli Dep. 57-58.)  Despite these claims, Plaintiffs never sought the assistance of a physician or a licensed therapist.  (Id.)  Plaintiffs submit no medical records to justify their emotional distress claims.  (Id.)  Lastly, Plaintiffs seek punitive damages and equitable relief.

## II.   **LEGAL STANDARD**

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party first must show that no genuine issue of material fact exists. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party shows this, then the burden shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. <u>Id.</u> at 324. The non-moving party must offer specific facts that establish a genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations, or speculation. See <u>Ridgewood Bd. of Educ. v. N.E. ex. rel. M.E.,</u> 172 F.3d 238, 252 (3d Cir. 1999). Also, the Court must consider all facts presented, and the reasonable inference drawn from them, in the light most favorable to the non-moving party. See <u>Pa. Coal Ass'n v. Babbit</u>, 63 F.3d 231, 236 (3d Cir.1995).

### III.   <u>DISCUSSION</u>

#### A. Punitive Damages

A claim made by the plaintiff may be deemed abandoned if the "party fails to offer any argument or evidence . . . in opposition to defendant's motion for summary judgment." <u>Desyatnik v. Atl. Casting & Eng'g Corp.,</u> No. 03-5441, 2006 WL 120163, at *1 (D.N.J. Jan. 17, 2006) (citing <u>Curtis v. Treloar</u>, No. 96-1239 1998 WL 1110448, at *9 (D.N.J. Aug. 27, 1998)). (The court held the plaintiff did not abandon his claim for punitive damages if the arguments in the reply brief directly supported the claim for punitive damages; so long as the argument was presented in response to the motion for summary judgment, the claim could stand.  <u>Id.</u>)

In the present case, Plaintiffs, in response to Defendants' motion for summary judgment, ardently support their previous assertions praying for a finding of punitive damages. Pl. Br. in Resp. to Def. Motion Summ. J. p. 4.  Plaintiffs set forth facts and law reiterating their

7

justification for the punitive damage claim set forth in their initial complaint.  Id.  Following the decision in Desyatnik, such an effort is adequate to sustain a previous claim for punitive damages.  As such, Plaintiffs cannot be held to have abandoned their claim for punitive damages merely because they did not include them in their response interrogatory or itemized damage list, as Defendants argue.  Def. Mot. Summ. J. 7, CMECF No. 31.

The New Jersey Punitive Damages Act requires the plaintiff to prove by "clear and convincing evidence" that the defendant acted with "actual malice," or with "wanton and willful disregard for persons to be foreseeably harmed" by their actions.  N.J. Stat. Ann. tit. 2A § 15-5.9 (West 1995).  "Actual malice" is defined as an "evil minded act." Id.  "Wanton and willful disregard" is defined as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." Id.  The key to the right of punitive damages is the wrongfulness of the intentional act. Rendine v. Pantzer, 661 A.2d 1202, 1215 (N.J. 1995).  The legislative purpose of the Punitive Damages Act was to establish more restrictive standards with regard to awarding punitive damages.  Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 916 A.2d 484 (N.J. Super. Ct. App. Div. 2007); Pavlova v. Mint Mgmt. Corp., 868 A.2d 322 (N.J. Super. Ct. App. Div. 2005).

If the plaintiff seeks punitive damages under a claim that the defendant acted with "wanton and willful disregard," the plaintiff must establish that the defendant "knew or had reason to know of circumstances which would bring home to the ordinary reasonable person the highly dangerous character of his or her conduct." Pavlova, 868 A.2d at 326; see also Hatala v. Morey's Pier Inc., No. 04-4679, 2007 WL 2159615 (D.N.J. June 25, 2007); McLaughlin v. Rosa Farms, Inc., 266 A.2d 284, 293 (N.J. 1970) (citing Krauth v. Israel Geller and Buckingham Homes, Inc., 157 A.2d 129, 133 (N.J. 1960).  (Punitive damages may be awarded where a

defendant "[c]onsciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result").  Plaintiffs seeking punitive damages cannot succeed if the evidence presented merely speaks to a finding of negligence or gross negligence. DiGiovanni v. Pessel, 260 A.2d 510 (N.J. 1970). Conduct deemed negligent, or even grossly negligent, falls short of satisfying the requisite level of indifference required for punitive damages claims.  Id.

To determine whether punitive damages should be awarded to a plaintiff, the fact finder must consider, but not limit itself to, the following: (1) the likelihood at the relevant time, that serious harm would arise from the defendant's conduct; (2) the defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct; (3) the conduct of the defendant upon learning that its initial conduct would likely cause harm; and (4) the duration of the conduct or any concealment of it by the defendant. N.J. Stat. Ann. tit. 2A § 15-5.12(b) (West 1995).

The Appellate Division of the Superior Court of New Jersey held that in order to satisfy the requirement of willfulness or wantonness, there must be a finding of a "positive element of conscious wrongdoing."  Enright v. Lubow, 493 A.2d 1288, 1298 (N.J. Super. Ct. App. Div. 1985).   Neither negligence nor gross negligence will validate such a judgment.  Id.  In Enright, the title insurance company negligently located an easement on the property that significantly reduced the value of the property.  Id. at 1302.  Plaintiffs attempted to sell the home, despite becoming aware of the misplaced easement.  Id.  The sale of the home did not proceed as contracted when the buyers discovered the state of the title; instead, the purchase price was reduced by $22,000. Id. at 1297.  Upon learning of this trouble, the insurance company offered to settle with the plaintiff for the value difference in the property. Id. at 1291. Plaintiffs rejected the

offer and instead sued for compensatory damages plus punitive damages and attorney's fees. Id. The court dismissed claims for punitive damages, as the actions of the insurance company, while negligent, did not illustrate deliberate or intentional harm.  Plaintiffs were left only with their direct compensatory damages. Id. at 1292-93.

This case is distinguishable from Willow Inn, wherein the Third Circuit Court of Appeals upheld an award for punitive damages based upon the defendant's repeated delays in making claim determinations, appointing an appropriate appraiser, and withdrawing cooperation during settlement negotiations.  Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co., 399 F.3d 224 (3d Cir. 2005).  The insurance company, PSM, repeatedly failed to respond to several of Willow Inn's reasonable requests within a timely manner.  Id. at 229.  In one instance, PSM failed to appoint an appraiser until almost eight months after Willow Inn's initial request.  Id.  On another occasion, PSM blatantly ignored correspondence regarding indemnification for a period of three months.  Id.  Based upon the severity and number of instances where the defendant showed "reckless indifference" to the foreseeable harm suffered by Plaintiffs, the Court of Appeals upheld the lower court's issuance of punitive damages.  Id.

In the present case, Defendants are entitled to summary judgment on Plaintiffs' claim for punitive damages.  Plaintiffs have not proffered sufficient evidence such that a reasonable jury could find punitive damages are warranted.  Rather, Plaintiffs set forth only conclusory accusations about the nature and intent of the Defendants' actions.  To permit a finding of punitive damages, the conduct must be "wanton or willful," carrying reckless indifference to foreseeable harm that would result from their actions.  N.J. Stat. Ann. tit. 2A § 15-5.9 (West 1995).  Plaintiffs' primary argument is that the Defendants took too long to respond to their initial complaint.  They assert that a period of eight months to make a determination on

Plaintiffs' complaint is "too long"; so long in fact, that it should be deemed recklessly indifferent.  Plaintiffs, however, fail to provide any additional evidence to show the delay was motivated by a conscious objective to harm Plaintiffs.

In fact, the record reveals quite the opposite.  Defendants maintained constant discourse with Plaintiffs through e-mail correspondence.  Regular updates were reported, and the status of the claim was consistently discussed with Mr. Granelli. Unlike Willow Inn, there were no significant or deliberate lapses in communication.  In Willow Inn, the court found the insurance company's intentional failure to acknowledge or respond to the plaintiff's request for appraisal was evidence of reckless indifference.  In the present case, Plaintiffs provide no such examples of Defendants' willful efforts to act in a manner that would cause foreseeable harm to Plaintiffs. Furthermore, as the Defendants point out, Mr. Granelli was not in fact named on the title insurance policy, and the company's willingness to communicate with him regularly illustrates its good faith efforts to assist Plaintiffs.

The facts of this case are strikingly similar to Enright, where homeowners became aware of a title defect, and then appealed to the insurance company for resolution of the issue.  There, as here, the insurance company conceded their mistake and took affirmative efforts to provide relief for Plaintiffs. As noted by the court in Enright, while the failure to cure within reasonable time may constitute negligence, there is not enough evidence to suggest a finding of reckless indifference. In both cases, the insurance company offered to settle for an amount deemed to represent the diminution in value of the property.  Currently, Defendants issued two settlement offers to Plaintiffs, both of which were rejected.

Defendants' actions were not recklessly indifferent, but rather reasonable, throughout the claim investigation.  It hired all necessary parties, exhausted all non-legal outlets for resolution of the issue, and when it became clear the issue would have to be resolved in court, it went forward at its own expense.  Despite Plaintiffs' desire for an immediate remedy, the title insurance company is not required under contract to proceed immediately into litigation.  It is within its right to assess the situation and pursue alternative resolutions to the dispute that do not involve legal proceedings.  As the record shows, part of Defendants' delay was due to contacting neighbors in the hopes of achieving a peaceful resolution to the dispute. Once it became apparent that this would not be feasible, Defendants appointed counsel and proceeded to court.  Even in the event that this procedure did not comply with the guidelines of the title insurance contract, Plaintiffs do not offer evidence of actions rising above a breach of contract.  No documentation, statements, or circumstances point to the company being motivated by a conscious awareness to harm Plaintiffs.  All of the evidence set forth in the record indicates Defendants did not deliberately act with reckless indifference to the foreseeable harm to Plaintiffs.  No reasonable jury would find that Defendants' actions rose to a level of reckless disregard for the welfare of Plaintiffs. The Court finds Defendants lacked the necessary indifference required to permit a finding that their conduct was sufficiently egregious to warrant punitive damages.

### B.  Emotional Distress Damages

Emotional distress damages for stress, anxiety, and nervousness are awarded as non-pecuniary damages following a showing of extreme emotional harm "such that no man (or woman) could be expected to endure."  Restatement (Second) of Torts §46 cmt. d, (1965). Emotional distress damages are not routinely awarded in breach of contract actions; however, they can be available "if the breach involves conduct that is both intentional and outrageous and

proximately causes severe, foreseeable emotional distress." Picogna v. Bd. Of Educ. Of Cherry Hill, 671 A.2d 1035, 1037 (N.J. 1996). See also, Fiore v. Sears, Roebuck & Co., 364 A.2d 572 (N.J. Super. Ct. Ch. Div. 1976). ("[B]reach provides a basis for recovery when it 'is wanton or reckless and the harm was foreseeable when the contract was made.'") Whether emotional distress can be found is a matter of law to be determined by the court. Id. Despite this narrow rule, emotional distress damages are exceedingly rare in contract actions. See e.g., Noye v. Hoffmann-La Roche, Inc, 570 A.2d 12, 15 (N.J. Super. Ct. App. Div. 1990) ("tort damages do not lie for breach of an implied covenant of good faith and fair dealing."); Cleveland Plaza Assocs., LLC v. Conte Entm't of Cranford, LLC, No. A-3832-06T1, 2007 WL 4372797 (N.J. Super. Ct. App. Div. Dec. 17, 2007) ("[o]n a promissory estoppels claim, the prevailing party is only entitled to recover 'damages resulting from its detrimental reliance upon promises made during contract negotiations.") (quoting Pop's Cones, Inc. v. Resorts Int'l. Hotel, Inc., 704 A.2d 1321, 1325 (N.J. Super. Ct. App. Div. 1998).

Additionally, in limited circumstances, emotional distress damages are permissible under certain statutory constructions. Neither the New Jersey Insurance Trade Practices Act nor the New Jersey Consumer Fraud Act, however, provide for recovery of emotional distress damages. Gennari v. Weichert Co. Realators, 691 A.2d 359, 369 (N.J. 1997) ("non-economic losses are not recoverable under the Consumer Fraud Act"); Cole v Laughrey Funeral Home, 869 A.2d 457, 463 (N.J. Super. Ct. App. Div. 2005) (emotional distress damages are not recoverable under the Consumer Fraud Act).

In the present case, Defendants' Motion for Summary Judgment on the claim of emotional distress damages is granted. As a matter of law, Plaintiffs failed to set forth a claim that would permit a reasonable jury to find in their favor. Plaintiffs did not proffer sufficient

evidence to permit a reasonable jury to find the Defendants' conduct was intentional or outrageous.  Additionally, Plaintiffs' emotional distress did not reach the requisite severity to sustain a cause of action.

Plaintiffs failed to make a showing of severe emotional distress.  Their description of the distress never reaches past conclusory assertions of discomfort.  While Plaintiffs contend they suffered a level of stress or anxiety, they failed to demonstrate that the level rose above common inconvenience.  In order to recover, Plaintiffs would have to demonstrate the level of distress was "such that no reasonable man [or woman] could have been expected to endure."  Plaintiffs' depositions, interrogatories, and complaint all fall short of providing anything more than conclusory assertions of anxiety and restlessness.  Neither Mr. nor Mrs. Granelli ever sought assistance for their distress from a licensed healthcare professional.  Though this is not a requirement, it is indicative of the level of discomfort Plaintiffs experienced.  As such, Defendants' motion for summary judgment as to emotional distress should be granted.

### C.  Failure to Mitigate

Defendant argues damages related to Plaintiffs' ownership of multiple homes should be dismissed on summary judgment because Plaintiffs' failed to properly mitigate their damages; however, sufficient dispute of material fact exists to bar summary judgment on this issue.  A duty to mitigate arises when the Plaintiff becomes aware of a breach. Restatement (Second) of Contracts § 46 cmt. f, (1981). In the present case, the threshold question is whether Plaintiffs were aware they would need to seek recourse with Defendants to resolve the Brown Dispute at the time it arose in January 2007. Despite Defendants' allegations, the record, when considered in light most favorable to Plaintiffs, indicates that factual questions remain regarding the nature

14

and extent of Plaintiffs' familiarity with the boundary issues at the time they purchased the Kearney Property.

A plaintiff has a duty to mitigate damages when "the defendant has already committed an actionable wrong, whether tort or breach of contract, then this doctrine limits the plaintiff's recovery by disallowing only those items of damages which could reasonably have been averted…" Ostrowshi v. Azzara, 545 A.2d 148, 151 (N.J. 1988).  It is well settled that the duty to mitigate begins upon the plaintiff's knowledge of the defendant's breach.  Restatement (Second) of Contracts cmt. f (1981) (The injured party is expected to arrange a substitute transaction within a reasonable time after he learns of the breach.)  There is no duty to mitigate until the plaintiff s aware that the defendant's actions have constituted a breach.  Koppers Co. Inc. v. Aetna Cas. & Sur. Co. 98 F.3d. 1440, 1448 (3d Cir. 1996) ("[D]uty to mitigate its damages arises upon defendant's breach of contract. . . [I]n the context of an insurance contract. . . upon insurer's breach by failing to indemnify the insured, the insured has a duty to mitigate its damages".  Plaintiffs, however, are not entitled to wait for a judicial finding of breach; rather, plaintiffs merely need to become aware of an actionable wrong.  Health Prof'l and Allied Emps. v. Bergen Reg. Med. Ctr, No. 08-CV-1041, 2010 WL 147938 at *3 (D.N.J. Jan. 8, 2010).  ("The court disagrees. . . that a duty to mitigate is conditioned upon an adjudication ascertaining the existence of such a breach.")  Furthermore, "the duty to mitigate damages in not applicable where the party whose duty it is primarily to perform the contract has equal opportunity for performance and equal knowledge of the consequences of performance."  Ingraham v. Trowbridge, 687 A.2d. 785, 791 (N.J. Super. Ct. App. Div. 1997).

Defendants' motion for summary judgment regarding Plaintiffs' failure to mitigate must be denied.  Plaintiffs set forth sufficient issues of material fact to preclude summary judgment.

Whether Plaintiffs' knowledge of the Brown Dispute constituted awareness of a breach will be determined by whether there was a duty to mitigate damages. Plaintiffs admit they were aware of the boundary disparity associated with Mr. Brown's property as early as January 2007. They claim, however, that they were not aware such a dispute constituted a breach of contract by the Defendants. Rather, Plaintiffs allege they believed the discrepancy would not require any legal or insurance remedy. They subsequently purchased the Kearney Property in January 2008. Following the purchase, the Van Driel sale of the Boonton Property fell through in August 2008. It was at this time Plaintiffs became aware of the significant title problem on their hands.

Plaintiffs immediately submitted a complaint claim to Defendants upon learning of the need to perfect title in August 2008. This point is particularly salient, as it gives credence to Plaintiffs' claim that they did not believe the Brown Dispute would affect the marketability of the property title. Plaintiffs, not having recognized an "actionable wrong" or "breach" on the part of Defendants could not be compelled to mitigate their damages in January 2007, as they were not yet aware they would incur any damages from forthcoming lost sales of the Boonton Property. The Granellis, ignorant of the knowledge their home's title was not marketable, purchased their dream home with the expectation they would carry a second mortgage for a period of months. They do not claim damages relating to the carrying cost of the Boonton Property until September 2008. This represents the earliest date after which Plaintiffs failed to sell the home due to title defects.

Defendants contend that Plaintiffs' familiarity with the Brown Dispute constitutes knowledge of a breach of the title insurance contract. The court does not reach this conclusion. Plaintiffs point out they did not believe the Brown Dispute would affect the sale of the home in any way. In fact, Plaintiffs disclosed the nature of the dispute to Van Driel, and both parties

16

moved forward toward the closing amicably.  The record paints Plaintiffs as motivated and proactive sellers. Plaintiffs' failure to file a claim with Defendants upon becoming aware of the Brown Dispute indicates one of two things to the court: (1) Plaintiffs in good faith did not believe the boundary dispute would have any impact on the property's title, or (2) they were keeping their fingers crossed and hoping to pass the headache on to the next buyer.  In any event, the nature of what Plaintiffs knew, and their motivation after uncovering the dispute, is a question for the fact finder.

In addition to the implication of the Brown Dispute, there are also questions of material fact relating to when Plaintiffs read and became aware of the contents of Mr. Richard Smith's letter detailing the nature of Plaintiffs' severe boundary problems.  Plaintiffs allege they did not actually read the contents of the letter until October 2008, despite receiving the letter in October 2007.  If in fact Plaintiffs read the letter upon receiving it in 2007, the nature of the Brown Dispute becomes less relevant, as the letter admittedly details Plaintiffs' significant boundary problems.  Knowledge of the letter and its contents could potentially serve as notice of an actionable wrong on behalf of the Defendants.  Plaintiffs, however, contend they did not read the letter, and were unfamiliar with any of Mr. Smith's assertions until Fall 2008.  This significant discrepancy is a serious dispute of material fact that must be left for the jury.  Due to the important nature of this material dispute, Defendants' motion for summary judgment must be denied.

17

### D.  Miscellaneous Damages

#### 1.      Damages for the Taxes on the Boonton Home

Defendants' motion for summary judgment on Plaintiffs' claim for relief relating to the

income tax exclusion for the sale of a principal residence is denied at this time.  Plaintiffs argue,

"as long as certainty exists as to the fact that damage has occurred, uncertainty regarding the

amount of damages will not bar recovery."  Pl. Brief at 13.  "Anticipated profits that are too

remote, uncertain, or speculative are not recoverable." Desai v. Bd. Of Adjustment of

Phillipsburg, 824 A.2d 166, 172 (N.J. Super. Ct. App. Div. 2003) (citing V.A.L. Floors Inc. v.

Westminster Comm. Inc., 810 A.2d 625, 631 (N.J. Super. Ct. App. Div. 2002)).

Section 121 of the Federal Tax code states, "[g]ross income shall not include gain from

the sale or exchange of property if,  during the five year period ending on the date of sale or

exchange, such property has been owned and used by the taxpayer as the taxpayer's principal

residence for periods aggregating two years or more."  26 U.S.C. § 121(a) (2010).  In the event

that taxpayers qualify for this section, they are permitted to exclude up to $250,000 as an

individual or $500,000 as a married couple. § 121(b). If, however, the use of the home

constitutes a 'nonqualified use,' that is, a use other than as the principal residence, then the

homeowners are not entitled to exclude any gain on the sale of the home from income.

In the instant case there is no guarantee that Plaintiffs will suffer the alleged damages of

losing the tax benefit.  The home still has not been sold.  Whether there will even be a gain

realized on the home, which would entitle Plaintiffs to the tax benefits, is uncertain.  The

conjectural nature of the future sale is precisely the type of factual speculation the standard is

designed to prohibit.  Too much uncertainty exists relating to the sale, including the

circumstances, price, and timing, to permit a finding of damages at this time resulting from the Defendants' alleged breach of contract.

Most importantly, Plaintiffs are still fully capable of moving back into the Boonton Property. In the event that Plaintiffs moved back into the home for a period of two or more years, they would qualify for the tax benefits under IRC Section 121. Allowing them to recover presently, despite the uncertainty as to the occurrence and amount of damages, would risk a potentially duplicative windfall for Plaintiffs. Defendants set forth a number of other arguments prohibiting recovery of the tax benefits, but presently the factual uncertainty surrounding the issue is sufficient to deny summary judgment at this time.

### 2. "Lost Income" From the Potential Sale of the Boonton Home

In order to recover lost profits, "the party must show the profits were lost as a result of the actionable conduct complained of." Cromartie v. Carteret Sav. & Loan, 649 A.2d 76 (N.J. Super. Ct. App. Div. 1994); Sullivan v. Transamerica Title Ins. Co., 532 P.2d 356, 357 (Colo. Ct. App. 1975) ("Where insured lost prospective sale of property due to discovery of easement that title insurer failed to exclude in title insurance commitment, he was not entitled to profit lost because of lost sale."); Southern Title Guaranty co. Inc., v Prendergast, 494 S.W.2d 154, 158 (Tex. 1973) ("Title Insurance is a contract of indemnity and the insured is limited to recovery for actual damages sustained.")

"Anticipatory profits that are too remote, uncertain, or speculative are not recoverable." Desai, 824 A.2d at 172. The uncertainty of damages relates to factual uncertainty, and not to uncertainty as to amount; the court must be aware damages have occurred. Id. New Jersey courts, however, typically require a fair basis for the calculation of lost profits. V.A.L Floors, Inc., 810

A.2d at 632; <u>J.L. Davis & Assocs. v. Heidler</u>, 622 A.2d 923 (N.J. Super. Ct. App. Div. 1993)

(quoting <u>Borbonus v. Daoud</u>, 111 A.2d 443 (N.J. Super. Ct. Ch. Div. 1955)). Speculative damage

calculations are typically only permissible when previous business experience allow the court to

make a reasonable estimate for the damage amount.  Sufficient evidence must be present to allow

at least an estimate with a reasonable degree of certainty.  <u>Id.</u>

      The specific issue of whether homeowners that failed to close on a sale of their home due

to a title defect, and subsequently experienced a decrease in the appraisal value of their home,

has not been considered in detail by the Third Circuit.  The difficulty of the current issue is that

Plaintiffs have not yet successfully sold the Boonton Property.  Although the value of the home

has almost certainly declined since the housing bubble burst in 2008, the same year the sale of

their home fell through, the court is not able to estimate with any precision the amount of their

loss.  While Plaintiffs urge the court to assess damages in the amount of the difference between

the lost sale and the current value of the home, little authority would support such a method.

Further, such a method would entitle Plaintiffs to a potential windfall verdict, as it is possible

they receive these damages, and the value of their home subsequently recovers to the pre-bubble

estimation.  Furthermore, until Plaintiffs sell the home, issues of fact will persist, and any

motions for summary judgment on this issue will remain premature.  Accordingly, Defendants'

motion for summary judgment as to this issue is denied at this time.

### 3.      Equitable Relief Damages

      Defendants' Motion for Summary Judgment as to equitable relief claims is granted.  As

noted above, speculative damages that give rise to potentially duplicative damage awards are not

recoverable.  Additionally, the New Jersey Consumer Fraud Act does not permit duplicative

damage awards.  The language of the statute, "any other appropriate legal and equitable relief," was not intended to permit duplicative awards for the same economic injury.  <u>49 Prospect St. Tenants Ass'n. v. Sheva Gardens, Inc.</u>, 547 A.2d 1134, 1149 (N.J. Super. Ct. App. Div. 1988).

In the present case, Plaintiffs seek equitable relief related to the economic injury suffered as a result of the breach of contract claim and the resultant inability to sell their home.  The equitable relief that Plaintiffs believe would be appropriate is the purchase of the Boonton Property by the Defendants.  No provisions in the title insurance contract require Defendants to purchase Plaintiffs' home in the event of a breach.

Such a judgment would be unduly duplicative and lead to a windfall judgment in favor of Plaintiffs.  Sufficient direct damage provisions exist to compensate Plaintiffs in whole. Equitable relief is necessary only to avoid inevitable injustice that would result.  No circumstances exist in this case that would require equitable relief.  There is no evidence the home will not be marketable once the title defects are resolved, which by all indications will happen as a result of the Defendants' legal efforts to perfect title.  Contrary to Plaintiffs' assertions justice would not be served by permitting a finding of equitable relief.

### 4.     Interest on Credit Cards and Loans

Plaintiffs' request for interest paid on their credit card debt, and other loan debt, is frivolous and speculative.  Defendants are correct in asserting that no reasonable determination could possibly be made by Plaintiffs that shows they would have paid the debt if they sold the Boonton Property in 2008.  The only support for this assertion is Plaintiffs' own testimony during depositions.  No other objective evidence lends to the argument that these debts would in fact have been paid.  Defendants' Motion for Summary Judgment on this claim is granted.

5.      Attorneys' Fees

Defendants' Motion for Summary Judgment on the issue of attorneys' fees must be denied.  Attorneys' fees may be awarded to a prevailing party when authorized by statute, court rule, or contract.  In the absence of bad faith actions on the part of the opposing party, litigants must pay their own attorney's fees.  Glass, Molders, Pottery, & Allied Workers Int'l Union v. Owens-Illinois, 941 F.2d 1201 (3d Cir. 1991).

The New Jersey Consumer Fraud Act provides that attorney's fees are available to a plaintiff who proves both an unlawful practice and establishes a prima facie case of loss.  N.J. Stat. Ann. tit. 56 § 8-19 (West 1995).  To show a loss, a plaintiff must merely provide an estimate of damages, calculated with a reasonable degree of certainty.  Cox v. Sears Roebuck & Co., 647 A.2d 454, 464 (N.J. 1994).  An unlawful practice includes the following: affirmative acts, knowing omissions, and regulation violations.  Id. at 461.

Defendants' motion for summary judgment as to attorneys' fees must be denied.  The New Jersey Consumer Fraud Act provides for issuance of attorneys' fees if plaintiff can show an unlawful practice and a loss.  Sufficient issues of material fact exist to permit a fact finder to determine whether any unlawful activities occurred.  Plaintiffs' significant expenditure following the alleged breach of contract is sufficient under the law to satisfy a potential finding of loss.  Accordingly, Defendants' motion as to attorneys' fees must be denied.

**IV.      CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is granted in part and denied in part.  An appropriate Order accompanies this Opinion

DATED:  June 8, 2012

s/ Jose L. Linares_____
JOSE L. LINARES
U.S. DISTRICT JUDGE